**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | ) | |
|---|---|---|
| **DAVID M. BUTLER,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL NO. 3:06CV599** |
| | ) | |
| **RUBY L. MARSH,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

This personal injury diversity case[1] came to be heard, by consent of the parties, for a bench trial on March 15, 2007, at the conclusion of which the Court took the matter under advisement pending further review of the parties' relevant evidentiary submissions. For the reasons set forth herein, the Court concludes by a preponderance of the evidence that the Plaintiff was contributorily negligent. Accordingly, judgment is rendered for the Defendant.

**I. Facts and Reasonable Inferences[2]**

This lawsuit arises from an August 17, 2004 motor vehicle accident on the Blue Ridge

---

[1] The Plaintiff is a resident of Kentucky, the Defendant is a resident of Florida, and the Plaintiff's Complaint seeks $450,000 in damages. As such, jurisdiction is properly conferred on this Court pursuant to 28 U.S.C. § 1332(a).

[2] The parties agreed to rely on a stipulated record to resolve this matter limited to deposition transcripts, the accident report prepared by the investigating officer, and relevant photographs of the accident scene and the damaged vehicles. (Def.'s Trial Mem. at 2) (docket entry no. 7.)

Parkway ("Parkway") in Roanoke County, Virginia.[3] The Court deems the following to be the relevant facts and material inferences upon which this matter is to be resolved:

1. At the time of the accident, both the Plaintiff, David M. Butler (the "Plaintiff"), and the Defendant, Ruby L. Marsh (the "Defendant"), were traveling northbound on the Parkway. (Def.'s Trial Mem. at 1.) The Plaintiff was operating a motorcycle while the Defendant was operating a GMC Savannah Van. (Id.)

2. The Parkway is comprised of two lanes (one northbound and one southbound) with a posted speed limit of 45 mph. (Id.)

3. The Plaintiff and Defendant were in a line of five vehicles traveling in the same direction in the northbound lane of the Parkway prior to the collision. The first vehicle is unidentified, but all of the evidence establishes that it was traveling well below the posted speed limit. In fact, various witnesses estimated the traveling speed to have been between 30 and 35 mph. (Stipulated Record, Ex. 2 ("Hensley Dep.") 17:7-8); Ex. 3 ("Blevins Dep.") 13:8-10; Ex. 4 ("Holter Dep.") 26:4-11; Ex. 6 ("Def.'s Dep.") 12:5-9; Ex. 7 ("Mrs. Marsh Dep.") 7:10-13.)

4. The second vehicle, a van, was occupied by two employees of the Hooter's restaurant chain, Donna Deal (the driver) and Melissa Hensley ("Hensley"). Hensley was looking in the rear view mirror of the vehicle to fix her makeup and, as a result, testified[4] that she was able to observe the vehicles behind the van. (Hensley Dep. 10:13-18; 18:7-19:7.) She further testified that "[w]hen the [Plaintiff's and Defendant's] vehicles were going to pass," i.e., change lanes, "that's when I turned around to watch what they were doing . . . ." (Id. 20:10-19; 25:13-15.) Thus, when the accident occurred, Hensley was turned around in her seat such that she had a direct view of the collision. As she testified, "I saw them hit." (Id. 25:13-15.)

5. The third vehicle was the motorcycle operated by the Plaintiff.

---

[3] Although venue would more properly be in the Western District of Virginia pursuant to a *forum non conveniens* analysis that would take into consideration the convenience of the witnesses and such other facts as any need for the fact finder to conduct a view of the accident scene, the parties have specifically consented to the jurisdiction of this Court and have submitted the matter on a stipulated record. Such a circumstance neutralizes the usual considerations so as to allow the Court to exercise its discretion. As such, the Court will resolve the matter rather than transfer it to a companion court that would cause further delay.

[4] All witnesses who "testified" did so by way of deposition which was submitted as evidence to be made part of the record.

6. The Defendant was driving the fourth car in line, with the Defendant's wife, Betty Marsh ("Mrs. Marsh"), riding as a passenger in the front seat.

7. The fifth vehicle was operated by Derek Blevins ("Blevins"). The last four vehicles were following each other closely because of the slow speed of the lead vehicle.

8. The Marshes had been following the Plaintiff for approximately five minutes, the duration of which the Plaintiff was weaving back and forth in his lane of travel and closely following the Hooter's van in front of him. (Def.'s Dep. 9:15-20 (following Plaintiff for 3 miles), 11:1-13 (Plaintiff was swerving); Mrs. Marsh Dep. 5:3-13 (swerving); Blevins Dep. 11:2-12:3 (swerving).)

9. Both the Plaintiff and the Defendant were frustrated with the slow traffic, and each began to make his move to pass the slow moving traffic.

10. The Plaintiff activated his left turn signal (Hensley Dep. 20:20-21:1; Blevins Dep. 14:12-17), while the Defendant waited to pass until he thought he had enough distance to clear all three vehicles in front of him (Def.'s Dep. 11:14-25).

11. The Defendant entered the southbound passing lane, and did not sound his horn prior to doing so. (Def.'s Dep. 12:21-23.) The accident followed.

12. National Park Service Ranger Jonathan Holter investigated, ultimately declining to charge anyone in connection with the accident.

### A. Witness Testimony

13. While the Plaintiff indicated his intention to enter the southbound passing lane by activating his left turn signal, the Defendant, before making the same lane change, did not activate the left turn signal on his van.

14. Hensley testified that, at the time the Plaintiff activated his left turn signal, the Defendant's van had already partially entered the southbound passing lane. (Hensley Dep. 22:1-20.) Indeed, she recalled that the Defendant's van entered the passing lane first. (Id. 28:8-11.)

15. The Plaintiff told Ranger Holter that he looked to his left and rear before signaling. (Stipulated Record, Ex. 1 (the "Accident Report") at 3.) However, each witness testified that the Defendant's van entered the southbound passing lane before the Plaintiff's motorcycle entered the same lane. (Hensley Dep. 28:8-11; Blevins Dep. 17:19-18:8;

Def.'s Dep. 13:2-8.)[5]

16. Once the Defendant was in the southbound lane, he increased his speed so as to overtake the Plaintiff. (Def.'s Dep. 13:2-8; Mrs. Marsh Dep. 8:22-9:12; Blevins Dep. 15:15-21.)

17. The right side of the Defendant's van collided with the left side of the Plaintiff's motorcycle, and the Plaintiff was thrown off of his motorcycle and injured. (Hensley Dep. 23:7-24:11; Blevins Dep. 15:22-16:5; Mrs. Marsh Dep. 11:19-12:1.)

18. The Plaintiff testified that he suffered memory loss as a result of the collision, and therefore has no recollection of the accident or the events leading up to it. (Pl.'s Dep. 32:18-22.)  No doctor has yet diagnosed the Plaintiff with a head injury, and he has had no treatment for his head injury. (Id. 46:19-47:2.)

19. The witnesses dispute whether the left wheels of the Defendant's vehicle left the roadway onto the grass shoulder of the southbound passing lane and, if they did, whether such an event occurred before or after the collision.  Hensley (the passenger in the Hooters van immediately preceding the Plaintiff's motorcycle) testified that she never saw the van leave the roadway. (Hensley Dep. 24:22-25:2.)  Blevins (the fifth of five cars in the chain) testified that the Defendant's van went onto the southbound shoulder both before and after the collision. (Blevins Dep. 17:6-13.)  The Defendant testified that he only left the roadway after the collision as part of his efforts to avoid the Plaintiff's motorcycle. (Def.'s Dep. 12:24-13:8; 19:23-20:2.)  Mrs. Marsh (the Defendant's wife) noted that the van swerved to the edge of the roadway after the collision, but does not know if it ever left the roadway. (Mrs. Marsh Dep. 8:12-21; 10:9-15.)

20. The Defendant admitted that his driver's license requires him to wear prescription glasses, but that he was not wearing his glasses at the time of the accident. (Def.'s Dep. 4:24-5:4 (requires glasses to drive); 5:2-7 (not wearing glasses at the time of the accident); 6:1-3 (same).

### B.  Physical Evidence

21. Physical evidence was also offered to demonstrate the location of the collision, as well as whether the Defendant's van was on the roadway when the collision occurred.  In his Accident Report, Ranger Holter noted that the Plaintiff's motorcycle left gouge marks eight inches inside the southbound lane when it fell to the ground. (Accident Report at 3; see also Holter Dep. 16:4-15.)  He noted that the footrest of the motorcycle made the

---

[5] Mrs. Marsh initially suggested in her deposition testimony that the Plaintiff's motorcycle never left the northbound lane before the collision, but she ultimately stated upon followup questioning that "I really don't know [whether the motorcycle entered the southbound lane]." (Mrs. Marsh Dep. 9:25-10:25.)

       gouge marks because of the heavy damage the footrest sustained, and because the footrest is the part of the motorcycle which protrudes furthest on the lower left side of the motorcycle. Ranger Holter also noted that the gouge marks in the road and property damage to the motorcycle indicated that the point of collision between the vehicles was four to four-and-a-half feet (4' to 4'6") *inside* the southbound lane. (Id. 21:8-19.)

22. As for whether the Defendant's van was on the roadway when the collision occurred, the evidence established that the width of the Defendant's van is six feet, seven inches (6'7"). (Def.'s Dep. 19:11-15; Holter Dep. 30:10-12.) The width of each lane of the Parkway is eleven feet (11'). (Holter Dep. 16:16-23.) As noted by Ranger Holter in his Accident Report, the right side of the Defendant's van was 4' to 4'6" from the center line of the Parkway when the collision occurred. Thus, the inference to be drawn is that, when the collision occurred, the Defendant's van would have been completely on the roadway in the southbound lane attempting to pass the three vehicles in front of him or, at worst, the left side of the van would have been a mere one inch (1") off of the roadway.

23. From this evidence, Ranger Holter concluded that the Plaintiff's motorcycle initially struck the passenger side center door handle of the Defendant's van. (Accident Report at 3.)

## II. The Court's Role in a Bench Trial

In bench trials, the judge serves as the sole fact-finder and, thus, assumes the role of the jury. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law. See generally Childrey v. Bennett, 997 F.2d 830, 834 (11th Cir. 1993). Because the Court acts as both the judge and the jury, it must resolve conflicts in the evidence, as well as make credibility assessments. Credibility determinations, however, are rendered more difficult when witness testimony is presented to the Court solely in deposition form, for the Court is prevented from observing the verbal and non-verbal behavior of the witnesses, including their reactions, responses, expressions, attitudes, tones of voice, eye contact, postures, body movements, and speech patterns. United States v. Mancillas, 183 F.3d 682, 701 n.22 (7th Cir. 1999). Indeed, a witness's behavior during the trial can reveal deception or untruthfulness through evasiveness on the witness stand that is more frequently than not undiscernible from the pages of a deposition.

Here, the Court is merely presented with "the cold pages" of the record such that credibility determinations must be discerned, if at all, from the totality of each witness's transcribed testimony. Id. Within this context, the Court must set forth "findings of fact and conclusions of law," subject to reversal only if clearly erroneous. Fed. R. Civ. P. 52(a); Holmes v. Bevilacqua, 794 F.2d 142, 147 (4th Cir. 1986).

### III. Analysis

Where subject matter jurisdiction is premised on diversity of citizenship, a court must apply the substantive law of the forum state (Virginia), including the forum state's choice of law rules. Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 623-24 (4th Cir. 1999) (citation omitted). Virginia is a traditional *lex loci* choice of law state in tort actions, and thus the substantive law of the place of the wrong (Virginia) governs the proceedings. See Dreher v. Budget Rent-A-Car Sys., Inc., 634 S.E.2d 324, 329 (Va. 2006) (citing Jones v. R.S. Jones & Assocs., 431 S.E.2d 33, 34 (Va. 1993)).

"In a negligence action, it is the plaintiff's burden to prove how and why the accident happened . . . and if that is left to conjecture, guess or random judgment, he cannot recover." Hoffner v. Kreh, 313 S.E.2d 656, 658 (Va. 1984) (citation omitted). Here, however, the Defendant argues that the Plaintiff's own contributory negligence imposes an absolute bar under Virginia law to the Plaintiff's potential recovery, and the Defendant must prove the Plaintiff's contributory negligence by a preponderance of the evidence. Sawyer v. Comerci, 563 S.E.2d 748, 752 (Va. 2002). The principles of contributory negligence are familiar and well-settled. "Contributory negligence is an affirmative defense that must be proved according to an objective

standard whether the plaintiff failed to act as a reasonable person would have acted for his own safety under the circumstances. The essential concept of contributory negligence is carelessness." Burroughs v. Keffer, 630 S.E.2d 297, 300-01 (Va. 2006) (quoting Jenkins v. Pyles, 611 S.E.2d 404, 407 (Va. 2005)).

> Contributory negligence is nothing more than the failure of the plaintiff to exercise ordinary care for his own safety, which, together with the negligence of another, brings about injury to him. If a plaintiff's failure to exercise due care helps to bring about or cause the injury to himself, he cannot recover from another whose negligence co-operated or concurred with his own neglect to produce the injury.

Yeary v. Holbrook, 198 S.E. 441, 450 (Va. 1938). Whether the Plaintiff in this case was contributorily negligent is a question of fact to be decided by this Court since it has assumed the role of fact finder. See Burroughs, 630 S.E.2d at 301.

A driver must use ordinary care to keep a proper lookout, keep his vehicle under proper control, and drive at a reasonable speed under the existing conditions. Seay v. United States, No. 3:04CV00001, 2004 U.S. Dist. LEXIS 25531, at * 9 (W.D. Va. Dec. 1, 2004) (citing Todt v. Shaw, 286 S.E.2d 211 (Va. 1982)); Litchford v. Hancock, 352 S.E.2d 335, 337 (Va. 1987) ("In the discharge of his duties, a driver [of a motor vehicle] is required to use ordinary care to observe other vehicles on the highway, to see what a reasonable person would have seen, and to react as a reasonable person would have reacted under the circumstances to avoid a collision.") (citations omitted). "If the driver of a vehicle looks and does not see what a reasonably prudent person would have been under the circumstances in time to take the necessary precautions to avoid danger, he is just as guilty of negligence as if he fails to maintain any lookout." Matthews v. Hicks, 87 S.E.2d 629, 631 (Va. 1955) (citations omitted).

The totality of the evidence indicates that the Plaintiff was contributorily negligent. Even

though Plaintiff had activated his left turn signal to indicate his desire to enter the southbound lane, various witnesses testified that the Defendant's van was already in the southbound lane when the Plaintiff made his attempt to pass the slower traffic.  Hensley, the passenger in the Hooters van traveling in front of the Plaintiff, turned around in the van so as to give herself a better view of the Plaintiff's and Defendant's vehicles.  (Hensley Dep. 25:3-15.)  From this vantage point she testified that when the Plaintiff's motorcycle made its move, the Defendant's van was already partially in the southbound traffic lane.  (Id. 21:1-20.)  Likewise, Blevins, the driver of the fifth and final vehicle in the chain of cars, testified that the Defendant's van had "complete[ly] enter[ed] that [southbound lane]" first before the collision occurred.  (Blevins Dep. 16:17-23.)  And, in his opinion, when the Defendant's van accelerated to overtake the Plaintiff's motorcycle, the van was "just about" even with the motorcycle immediately preceding the collision.  (Id. 16:24-17:3.)  Mrs. Marsh, the passenger in the Defendant's car, noted that the Defendant's van was about "halfway by" the Plaintiff's motorcycle when the accident occurred.  (Betty Marsh Dep. 11:19-12:1.)  And the Defendant testified that he was "passing the motorcycle" and had "secured the southbound lane" prior to the collision.  (Def.'s Dep. 13:2-12.)  By all accounts, those witnesses able to view the parties' conduct prior to the accident indicate that the Defendant's van was traveling parallel to the Plaintiff when the Plaintiff chose to pass the slower moving traffic.  In other words, when the Plaintiff made his move, he was already being overtaken by the Defendant's van.

      The physical evidence corroborates such a conclusion, and otherwise confirms that the collision occurred in the southbound (passing) lane.  Ranger Holter, a law enforcement officer certified as an accident reconstructionist and who has investigated nearly 200 car accidents

during his career (Holter Dep. 33:13-20), testified that the accident occurred in the southbound lane. (Id. 21:8-22:6.) The first gouge mark left by the motorcycle was located eight inches to the left of the center lane of the Parkway, *i.e.*, in the passing lane. (Id. 16:4-15.) Ranger Holter also concluded that, based on the scratches and dents left on the Defendant's van, the motorcycle struck the van's passenger side door handle and that this was the first point of impact in the collision. (Id. 17:24-18:24.) The entire width of the parkway is twenty-two feet (22'), with the width of each lane being eleven feet (11'). (Id. 16:16-23.) The width of the Defendant's van is six feet, seven inches (6'7"). (Id. 30:10-12.) Based on witness testimony and the physical evidence recovered at the scene, Ranger Holter concluded that, at the time of the collision, the right side of the van was four feet, six inches (4'6") into the southbound lane from the center point of the roadway. The reasonable deduction to be made from this evidence is that the Defendant's van was in the southbound passing lane when the collision occurred. Indeed, Hensely unequivocally testified that the collision point between the two vehicles was in the "passing lane." (Hensely Dep. 24:15-21.) Because the van was parallel to the motorcycle at the time of the collision, and because the collision occurred in the passing lane, the Court concludes that the Plaintiff failed to keep a proper lookout and that his negligence was the proximate cause of his injuries.[6]

---

[6] Blevins testified that when the Defendant pulled into the southbound lane to overtake the Plaintiff, the Defendant's van ran off of the road and hit the motorcycle in the Defendant's attempt to "overcorrect." (Blevins Dep. 22:20-23:9.) This testimony is not corroborated by any of the other witnesses to the accident. Moreover, Ranger Holter was unable to identify any tire marks on the shoulder of the Parkway matching the tires of the Defendant's van, and neither the Defendant nor his wife testified that the Defendant suddenly directed the van toward the motorcycle in an attempt to "overcorrect." Additionally, there is no suggestion by Blevins that he was forced to take any evasive action as would have been presumably necessary because the Marsh vehicle would have swerved into the path of the Blevins' vehicle by "overcorrecting."

The Defendant cites <u>Hot Shot Express, Inc. v. Brooks</u>, 563 S.E.2d 764 (Va. 2002), for the proposition that he is entitled to a presumption that he exercised ordinary care because of his retrograde amnesia suffered as a result of the collision. In <u>Brooks</u>, the plaintiff was injured after her car struck the back of the defendant's tractor-trailer. The plaintiff testified (similar to here) that she had no recollection of how the accident occurred and very little recollection of her subsequent treatment in the hospital for several weeks. <u>Id.</u> at 766. The plaintiff argued that she was entitled to a presumption of ordinary care because of her amnesia, and the trial court granted her request for an instruction reflecting the same. <u>Id.</u>

The Supreme Court of Virginia held this instruction to have been given in error, and that such error was not harmless. The Court first held that "the presumption of ordinary care is applicable to a plaintiff who establishes that his or her retrograde amnesia was caused by injuries suffered in an accident in the absence of proof, either from an eyewitness or other evidence, to the contrary." <u>Id.</u> at 770. The plaintiff in <u>Hot Shot</u>, however, did not offer any evidence in the record to establish that her memory loss was caused by the injuries she suffered in the accident. She did not attempt to identify the cause of her loss of memory. No doctors opined that her loss of memory was caused by her injuries. Significantly, the Court observed that "although the apparent force of the impact of the collision between the parties vehicles suggests that [the plaintiff] probably suffered retrograde amnesia as a result, such a conclusion would not be based upon fact but, rather, pure speculation." <u>Id.</u> Similar to the present case, the Plaintiff here has offered no medical evidence to support the conclusion that his loss of memory was caused by the injuries he sustained in the accident. It is certainly reasonable that the "impact of the collision between the parties' vehicles suggests that [the Plaintiff] probably suffered retrograde amnesia as

a result," but such a conclusion "would not be based upon fact but, rather, pure speculation." Hot Shot, 563 S.E.2d at 770. This is especially true in light of the fact that the Plaintiff did make a limited statement during the recovery from his injuries (that he looked to his left and rear before signaling) (see Accident Report at 3), yet at the same time also claimed he could not remember anything at all about the accident or the relevant events preceding it. (Pl.'s Dep. 32:18-22.) Thus, as was the case in Hot Shot, the Plaintiff is not entitled to a presumption of ordinary care because he failed to establish that his retrograde amnesia was caused by the injuries he suffered in the accident. Hot Shot, 563 S.E.2d at 770.

Finally, the Plaintiff cites Va. Code Ann. § 46.2-842 for the proposition that the Defendant was required to provide an audible signal, *i.e.*, honk his horn, before initiating a pass around the Plaintiff. (Pl.'s Trial Mem. at 5.) Section 46.2-842 mandates that "*the driver of an overtaken vehicle shall give way* to the right in favor of the overtaking vehicle *on audible signal* and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle.*"* (Emphasis added). Clearly, this Section imposes an affirmative duty on the driver of a vehicle being overtaken to yield to the overtaking vehicle if the overtaking vehicle first provides an "audible signal." But the inference Plaintiff suggests to be deducible from this Section's language – that an overtaking vehicle is required to give an audible signal each and every time he chooses to pass another vehicle – does not follow. At one time, Virginia law required the driver of an overtaking vehicle to give an audible warning before passing or attempting to pass another vehicle proceeding in the same direction. See Va. Code Ann. 46.2-840 (repealed 1996) ("The driver of an overtaking motor vehicle . . . shall, when necessary to ensure safe operation, give an audible warning with his horn or other warning device before passing or attempting to

pass a vehicle proceeding in the same direction."). However, the General Assembly removed such a requirement when it repealed Section 46.2-840 more than a decade ago. 1996 Va. Acts ch. 147, pg. 243. Drivers of overtaking vehicles are no longer statutorily required to sound their horns before passing other vehicles and, therefore, the Defendant was under no obligation to provide such a signal to the Plaintiff so long as the failure to do so was reasonable under the circumstances.

Here, the greater weight of the evidence demonstrates that the Plaintiff failed to maintain a proper lookout in attempting to execute a lane change to pass the vehicles in front of him. And his failure to do so, even in spite of the likely concurrent negligence of the Defendant (*e.g.* not wearing his prescription glasses, failing to activate his left turn signal before making the lane change, and attempting to pass three vehicles at once), was a proximate cause of his injuries. Accordingly, judgment must be rendered for the Defendant.

An appropriate Order shall issue.

_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge

Date: 3/28/07